# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MBA ENGINEERING, INC., as Sponsor and Administrator of the MBA ENGINEERING, INC. EMPLOYEES 401(K) PLAN and the MBA ENGINEERING, INC. CASH BALANCE PLAN, and CRAIG MEIDINGER, as Trustee of the MBA Engineering, Inc. Employees 401(k) Plan and the MBA Engineering, Inc. Cash Balance Plan, Individually and as representative of all others similarly situated,** | § § § § § § § § § § § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § § | **Case No: 3:20-cv-01915-E** |
| **MATRIX TRUST COMPANY, MATRIX SETTLEMENT AND CLEARANCE SERVICES, LLC, and MSCS FINANCIAL SERVICES DIVISION OF BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC,** | § § § § § § § | |
| *Defendants.* | § § | |

---

## FIRST AMENDED CLASS ACTION COMPLAINT

---

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Plaintiffs MBA Engineering, Inc. ("MBA"), as sponsor and administrator

of the MBA Engineering, Inc. Employees 401(k) Plan (the MBA Engineering, Inc. Retirement

Plan) and the MBA Engineering, Inc. Cash Balance Plan (collectively, the "Plans"), the Plans in

their own right, and Craig Meidinger ("Meidinger"), as the Plans' Trustee (MBA, the Plans, and

Meidinger collectively as, "Plaintiffs"), and, who on their own behalf and on behalf of others

**Appendix 001**

similarly situated, file this Class Action Complaint against Defendant Matrix Trust Company ("Matrix"), Defendant Matrix Settlement and Clearance Services, LLC ("MSCS"), and Defendant MSCS Financial Services Division of Broadridge Business Process Outsourcing, LLC, ("MSCS Financial," and collectively with MSCS and Matrix, "Defendants") and would respectfully show the Court as follows:

## I.   **INTRODUCTION**

1.      This is a case for strict liability under the Employee Retirement Income Security Act of 1974 ("ERISA") and other sections of ERISA and state laws. Defendants unlawfully retained substantial amounts of monies from over 60,000 account holders ("Customers") through nondisclosure and concealment. Without discovery, Plaintiffs cannot estimate the total amount of money that Defendants unlawfully retained, but in all likelihood, the amounts total many millions of dollars, if not hundreds of millions or more.[1]

2.      As of this date, Defendants have retained, without satisfying strict disclosure obligations, three categories of monies: 12b-1 fees, non-float cash interest, and float cash interest (collectively, the "Funds"). Defendants retained Funds in each of these categories from large portions of (if not all) Customer assets which averaged roughly over $126 billion, in total, over the last six years.

3.      Because of this, Defendants are obligated to repay these Funds to their Customers under ERISA, ERISA's implementing regulations, and state law.

---

[1] For example, rates for 12b-1 fees alone, discussed below, commonly range from 0.25% to 0.75% per annum. This amount by itself would be very large considering Matrix averaged over $126 billion of custodial assets over the relevant time period.

**Appendix 002**

## II.    <u>BACKGROUND INFORMATION</u>

4.    Defendants are a custodian and service providers who primarily serve employee benefit plans qualified under ERISA. As a custodian, they are a fiduciary under ERISA. *Total Plan Servs., Inc. v. Texas Retailers Ass'n, Inc.*, 925 F.2d 142, 143 (5th Cir. 1991) (citing 29 U.S.C. § 1002(14)(A) and holding "All plan administrators, officers, trustees, and custodians are fiduciaries for purposes of ERISA.").

5.    Custodians, like Defendants, are banks which take possession of Customer assets in exchange for a fee. During the last six years, Defendants experienced rapid growth. In just three years from 2014 to 2017, Defendants grew their business by more than 400% in customer assets to almost $200 billion. During this time of rapid and expansive growth, Defendants neglected multiple regulatory requirements imposed by ERISA and the U.S. Department of Labor ("DOL") which impose strict liability.

6.    A group of requirements Defendants violated, which is germane to this case, is the disclosure requirements under ERISA Section 408(b)(2). 29 U.S.C. § 1108(b)(2). As set out in more detail below, Defendants cannot retain any monies as compensation without complying with highly regulated and narrowly interpreted disclosure requirements. These disclosure requirements and notices are commonly referred to by the underpinning ERISA Section as "408(b)(2) Notices."

7.    Under ERISA, Defendants are strictly liable for any "transaction, if [Defendants] know or should know that such transaction constitutes a direct or indirect. . . sale or exchange, or leasing, of any property between the plan and a party in interest. . . [or] transfer to, or use by or for the benefit of a party in interest, of any asset of the plan." 29 U.S.C. § 1106(a)(1) ("Prohibited Transactions").

**Appendix 003**

8.    ERISA's Prohibited Transaction section is broad in keeping with ERISA's mandated purpose of "guaranteeing" that participants receive benefits they are entitled to. *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 607 (1993) ("Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it.").

9.    Every payment of compensation to a custodian or other service provider, like Defendants, falls within ERISA's Prohibited Transaction definition and would give rise to liability but for a separate exception mechanism. 77 Fed. Reg. 23, at 5632 (Feb. 3, 2012) (DOL summarizing this structure). Congress intended the Prohibited Transactions to be the default position after years of study and drafting; therefore, Congress fashioned an exception for compensation to service providers, like custodians, rather than defining such compensation out of ERISA's Prohibited Transactions. *Id.*

10.    For that reason, ERISA Section 408(b)(2) saves service provider compensation from the broad Prohibited Transaction definition so long as multiple requirements are met (detailed below). 29 U.S.C. 1108(b)(2) (exempting "Contracting or making reasonable arrangements with a party in interest for. . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefore."). 77 Fed. Reg. 23, at 5632 (Feb. 3, 2012).

11.    Defendants bear the burden of proving entitlement to a prohibited transaction exception. *E.g., Perez v. Bruister,* 823 F.3d 250, 265 (5th Cir. 2016) ("Defendants did not carry their burden to qualify for the ERISA § 408(e) adequate consideration affirmative defense, hence the transactions between the ESOP and BFLLC were prohibited by ERISA § 406(a)(1)(A)"); *Donovan v. Cunningham*, 716 F.2d 1455, 1468 (5th Cir. 1983) ("As the Supreme Court has

**Appendix 004**

observed in a different context, it seems 'fair and reasonable' to place the burden of proof upon a party who seeks to bring his conduct within a statutory exception to a broad remedial scheme.").

***Defendants' Disclosure Obligations and Violations***

12. Defendants' key wrongdoings in this case stem from their failure to disclose that their Customers' assets were earning non-float cash interest, earning float cash interest, whether or how much they were earning 12b-1 fees, and that Defendants kept that money as compensation. Alternatively, Plaintiffs allege Defendants failed to disclose that they paid portions of the Funds to third parties or parties in interest, if discovery later shows they made such payments. Defendants failed to disclose all the foregoing in violation of multiple duties under ERISA and other laws.

13. Defendants' disclosure obligations are rooted in the "reasonable compensation" requirement of ERISA Section 408(b)(2). 29 U.S.C. § 1008(b)(2) (only granting the prohibited transaction exception if compensation was reasonable). The DOL, acting pursuant to Congressional mandate and entitled to *Chevron* deference, has defined "reasonable compensation" to require, at a minimum, disclosure of compensation of any kind. 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C). The requirement includes direct compensation, indirect compensation, any other kind of compensation, and expressly includes 12b-1 fees and float interest. *Id.*; DOL Field Assistance Bulletin No. 2002-03. Further, Defendants were required to provide these disclosures in writing. 29 C.F.R. § 2550.408b-2(c)(1)(iv); DOL Field Assistance Bulletin No. 2002-03.

14. Custodians and service providers, like Defendants, must provide a direct written disclosure to their account holders of all compensation they will receive and pay to parties in interest. Those include 12b-1 fees and all cash-based interest, whether for cash in a float status or not. Custodians and service providers typically document their disclosures by requiring the customer to sign a written receipt and saving it to the customer's account file.

**Appendix 005**

15.     Defendants, however, did no such thing. Defendants have a standard custodial account agreement they use for all customers that has not materially changed, for purposes of this case, during the entire relevant time period. Defendants standard custodial account agreement does not provide 408(b)(2) notices for the Funds. Further, Defendants did not employ any other means to disclose that their customers' assets were generating the Funds and that Defendants kept them.

***Defendants Failed to Disclose 12b-1 Fees That They Unlawfully Kept***

16.     Defendants' custodial account agreement does not mention 12b-1 fees whatsoever among its compensation terms, and Defendants never provided supplemental disclosures to their Customers regarding 12b-1 fees. Defendants used the same custodial account agreement for all of its customers.

17.     ERISA and the DOL require all service providers and fiduciaries, including Defendants, to disclose the following to the plans: (1) the services that will be provided; (2) a description of all direct compensation; (3) a description of all indirect compensation which includes disclosure of the (a) exact service that money will be received for; (b) the identification of the payer of the compensation; and (c) a description of the arrangement between the payer and the fiduciary or service provider; and (4) a description of all fees charged directly against the plan's investment and the amount charged, identification of the services for which the compensation will be received, and identification of the payers. 29 C.F.R. § 2550.408b-2(c)(1)(iv).

18.     Rather than following these disclosure requirements, Defendants opted for an atypical and error-prone 408(b)(2) approach. Rather than ensuring its own compliance with ERISA Section 408(b)(2) and the DOL's regulations thereunder, as is required, Defendants ignored the process and purported to delegate their responsibility to provide Defendants' customers 408(b)(2) notices to third party administrators. Defendants cannot, however, shift their obligations to third

parties pursuant to ERISA. *See* 29 U.S.C. § 1110(a) ("any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA] shall be void as against public policy"). Further, those third parties also failed to provide the required disclosures.

19.     As of the date of this filing, Plaintiffs are already aware of over 100 of Defendants' customers who never received 408(b)(2) notices from Defendants concerning 12b-1 fees or the other Funds at issue. For example, Plaintiffs were falsely told by third parties that 90% of the 12b-1 fees Defendants would receive would be paid to the Plaintiffs. However, records now show that did not happen. Accordingly, Defendants have, without disclosure, either kept the 12b-1 fees entirely or paid portions of them to parties in interest. Discovery will reveal what Defendants did with the 12b-1 fees, but either case constitutes a prohibited transaction. Plaintiff is further informed and believes and, based thereon, alleges that many thousands more prohibited transactions exist by virtue of Defendants' error-prone and legally insufficient 408(b)(2) compliance approach.

### *Defendants Failed to Disclose Cash Interest They Unlawfully Kept*

20.     In addition to 12b-1 fees, Defendants also kept the interest their Customers' cash generated. As the custodian, Defendants would hold cash for their Customers in two circumstances. The cash would be in either a "float" or "non-float" state. For either situation, Defendants assert in their custodial agreement that all interest earned by each Customer's assets will be applied to the Customer accounts. But this was false.

21.     Cash is in a float state where it is in the process of being disbursed or invested pursuant to instructions. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800–01 (7th Cir. 2011). When it is not in a float state, Defendants would also hold the cash for its Customers. The

cash, whether in a float state or not, produced interest, and Defendants retained this interest without disclosing it.

22.     Defendants never updated their custodial account agreement or took other actions to comply with ERISA after the DOL revised its regulations in 2002. In 2002, the DOL interpreted ERISA Section 408(b)(2) and identified minimum requirements for disclosure of float cash interest. Those requirements include (1) disclosing "specific circumstances under which float will be earned and retained"; (2) establishing, disclosing, and adhering to specific time frames when float cash will be invested; (3) disclosing when that float period commences; and (4) disclosing the rate or manner of determining float interest rate. DOL Field Assistance Bulletin No. 2002-03.

23.     Courts use this DOL guidance for purposes of ERISA liability. *See Ruppert v. Principle Life Ins. Co.*, 813 F.Supp.2d 1089 (S.D. Iowa 2010); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 592 (S.D. Tex. 2003); *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930–33 (9th Cir. 2006).

24.     Defendants failed to disclose these required items; therefore, they are not entitled to rely on ERISA Section 408(b)(2) for the float cash interest they retained.

***Defendants Failed to Disclose the Interest on Customer Cash Assets that They Unlawfully Retained.***

25.      In addition to unlawfully retaining 12b-1 fees and float cash interest, Defendants also kept all interest their Customers' cash earned. Defendants' form custodial agreement is completely silent on this form of compensation. Defendants also did not disclose the interest earned by their customer's cash anywhere else.

26.     To the contrary, Defendants' custodial account statements instead portrayed a deceptive picture that their Customers' cash did not earn any interest. Defendants provided Customer statements that represented that the Customers' assets did not earn any interest. Those

**Appendix 008**

statements affirmatively represented the Customers' assets earned zero dollars in interest. In actuality, Defendants' Customers earned interest on their cash, and Defendants wrongfully kept it for themselves.

### III.    CLASS ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the defined classes below.

29.    **Numerosity of Classes:** The members of the Classes are so numerous that joinder of all members is impractical. Defendants act as the custodian and affiliated service provider for over roughly 60,000 Customer benefit plans, all of whom could bring claims for these violations. Joining each plan and each participant is impractical and a waste of judicial resources.

30.    **Existence of Predominance of Common Questions of Fact and Law:** Moreover, numerous questions of law and fact are common to the Classes and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    a.    Whether Defendants are a fiduciary of the Plan and Classes;

    b.    Whether Defendants entered into prohibited transactions under ERISA;

    c.    Whether Defendants met an exception under the prohibited transactions section of ERISA;

    d.    Whether Defendants retained 12b-1 fees;

    e.    Whether Defendants disclosed 12b-1 fees;

    f.    If Defendants disclosed 12b-1 fees, was the disclosure adequate under ERISA;

    g.    Whether Defendants retained non-float interest on cash assets;

    h.    Whether Defendants disclosed non-float interest on cash assets;

i.   If Defendants disclosed non-float interest on cash assets, whether the disclosure was adequate under ERISA;

j.   Whether Defendants retained float interest on cash assets;

k.   Whether Defendants disclosed float interest on cash assets to its Customers;

l.   If Defendants disclosed float interest on cash assets, whether the disclosure was adequate under ERISA;

m.   Whether Defendants breached their fiduciary duties under ERISA by engaging in the conduct described herein;

n.   Whether Defendants breached their fiduciary duties under state law by engaging in the conduct described herein;

o.   Whether Defendants were unjustly enriched for retaining the Funds;

p.   Whether the Funds were the property of the Classes;

q.   Whether Defendants unjustly retained the property of the Classes;

r.   Whether Plaintiffs are entitled to injunctive relief requiring Defendants to stop its practice of retaining float interest on cash assets;

s.   Whether Plaintiffs are entitled to equitable relief requiring Defendants to return the Funds to their customers;

t.   Whether Plaintiffs are entitled to injunctive relief requiring Defendants to stop its practice of failing to disclose float interest on cash assets to its Customers; and

u.   Whether Defendants raise any affirmative defenses that are universal in application.

31.   **Typicality:** Plaintiffs' claims are typical of the members of each Class because they are all based on the same nondisclosures. Defendants used the same form custodial account documents for all members of each Class who executed it, but the documents did not provide the

**Appendix 010**

required disclosures. Defendants also maintain the custodial account documents in a Customer specific file in the same way for all members of each Class. Defendants' website further confirms that it uses the same custodial account agreement. Further, Defendants did not provide the required disclosures to the Class in any other way. Thus, whether each Class member executed the custodial agreement or not, Defendants failed to make their required disclosures concerning the Funds.

32.     **Adequacy:** Plaintiffs will also fairly and adequately represent the Classes, and have retained counsel experienced and competent in the prosecution of ERISA litigation and class actions. Plaintiffs have no interests antagonistic to those of other members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action. Plaintiffs' counsel has also committed the resources to adequately represent the Class.

33.     **Superiority:** This action may be properly certified under Federal Rule of Civil Procedure 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Classes would create a risk of adjudications with respect to individual members of the Classes that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

34.     Alternatively, this action may also be properly certified under Rule 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive, declaratory, or other appropriate equitable relief applicable to the Classes as a whole.

**Appendix 011**

35.     Additionally, this action can be properly certified under Rule 23(b)(3) because the questions of law or fact stated above that are common to all Class members predominate over any questions affecting only individual members and the class action is a superior method for fairly and effectively adjudicating the controversy.

## IV.    CLASS DEFINITIONS

39.     This class action is divided into the following Classes:

**ERISA 12b-1 Class:** All of Defendants' Customers which were ERISA qualified plans whose assets generated 12b-1 fees that Defendants retained.

**Non-ERISA 12b-1 Class:** All of Defendants' Customers which were not ERISA qualified plans whose assets generated 12b-1 fees that Defendants retained.

**ERISA Non-Float Class:** All of Defendants' Customers which were ERISA qualified plans whose cash assets generated interest when not in a float status that Defendants retained.

**Non-ERISA Non-Float Class:** All of Defendants' Customers which were not ERISA qualified plans whose cash assets generated interest when not in a float status that Defendants retained.

**ERISA Float Class:** All of Defendants' Customers that were ERISA qualified plans whose cash assets generated interest when in a float status that Defendants retained.

**Non-ERISA Float Class:** All of Defendants' customers that were not ERISA qualified plans whose cash assets generated interest when in a float status that Defendants retained.

40.     Hereinafter, the ERISA 12b-1 Class, the ERISA Non-Float Class, and the ERISA Float Class shall be referred to collectively as the "ERISA Classes." The Non-ERISA 12b-1 Class, the Non-ERISA Non-Float Class, and the Non-ERISA Float Class shall be referred to collectively as the "Non-ERISA Classes." Both the ERISA Classes and the Non-ERISA Classes shall be referred to collectively as the "Classes."

**Appendix 012**

## V.     PARTIES

41.     Plaintiff MBA Engineering, Inc. ("MBA") is a corporation organized and existing under the laws of Minnesota, with its principal place of business in Shoreview, Minnesota. MBA is the Plans' Sponsor under ERISA 29 U.S.C. § 1002(16)(A), the Plans' Administrator under ERISA 29 U.S.C. § 1002(16)(A), and a fiduciary of the Plans under ERISA 29 U.S.C. §§ 1002(21)(A), 1102. As a fiduciary with respect to the Plans, MBA may bring this action against Defendants pursuant to ERISA. 29 U.S.C. §§ 1132(a)(2-3). Like all putative Class members, MBA had custodial accounts for each of the Plans with Defendants which produced 12b-1 fees, float interest, and non-float interest which Defendants retained.

42.     Plaintiff MBA Engineering, Inc. 401(k) Plan ("MBA 401(k) Plan") is a qualified plan under ERISA with legal status to sue in its own right. 29 U.S.C. § 1132(d). Like all putative Class members, the MBA 401(k) Plan was a Customer of Defendants, and its assets generated 12b-1 fees, float interest, and non-float interest, all of which Defendants retained.

43.     Plaintiff MBA Engineering, Inc. Cash Balance Plan ("MBA Cash Plan") is a qualified plan under ERISA with legal status to sue in its own right. *Id.* Like all putative Class members, the MBA Cash Plan was a Customer of Defendants, and its assets generated 12b-1 fees, float interest, and non-float interest, all of which Defendants retained.

44.     Plaintiff Craig Meidinger is an individual. Mr. Meidinger is the owner of MBA, and Trustee of the Plans. As Trustee of the Plans, Mr. Meidinger is a fiduciary with respect to the Plans under ERISA 29 U.S.C. §§ 1002(14)(A), 1102. As a fiduciary with respect to the Plans, Mr. Meidinger may bring this action against Defendants pursuant to ERISA. 29 U.S.C. § 1132(a)(2–3).

**Appendix 013**

45.     Defendant Matrix Trust Company is a bank incorporated under the laws of Delaware, with its principal place of business located at 717 17th Street, Suite 1300, Denver, Colorado 80202. Matrix is a fiduciary to the Plans pursuant to ERISA 29 U.S.C. §§ 1002(21)(A), 1102(a)(1), 1103(a), because it, in fact, exercised authority and control over the management or disposition of the Plans' assets. See also *Total Plan Servs., Inc. v. Texas Retailers Ass'n, Inc.*, 925 F.2d 142, 143 (5th Cir. 1991) (citing 29 U.S.C. § 1002(14)(A) and holding "All plan administrators, officers, trustees, and custodians are fiduciaries for purposes of ERISA."). Matrix "will, by definition, always be a fiduciary under ERISA as result of its authority or control over plan assets." Employee Benefits Security Administration, United States Department of Labor, Field Assistance Bull. No. 2004-03, Fiduciary Responsibilities of Directed Trustees (2004). Matrix is also a service provider to the Plans as defined by the DOL because it entered into contracts with the Plans or the TPA's of the Plans to perform services and expected compensation of over $1,000. 29 C.F.R. § 2550.408b-2(c)(1)(iii). Matrix exercised control over the Plans' and Class members' assets by depositing them in an account at a separate financial institution over which it had exclusive control, writing checks to be paid by the Plans' assets, directing wire transfers to be paid by the Plan's assets, and retaining the Funds without disclosing them.

46.     Defendant Matrix Settlement & Clearance Services, LLC ("MSCS") is a wholly-owned subsidiary of the same parent company as Matrix. MSCS is incorporated under the laws of Delaware, with its principal place of business located at 717 17th Street, Suite 1300, Denver, Colorado 80202. Matrix contracted with MSCS to perform services for the Plans and Class members. MSCS accepted compensation for those services from the Plans and Class members as well as from their assets. MSCS is also a fiduciary to the Plans pursuant to ERISA 29 U.S.C. §§ 1002(21)(A), 1102(a)(1), 1103(a), because it, in fact, exercised authority and control over the

**Appendix 014**

management or disposition of the Plans' assets by retaining the Funds without disclosing them. MSCS is also a service provider to the Plans and Class members as defined by the DOL because it entered into contracts with the Plans or for the Plans to perform services and expected compensation of over $1,000. 29 C.F.R. § 2550.408b-2(c)(1)(iii). MSCS provided customer service support functions to the Plans' and Class members which included handling contributions, disbursements, investments, addressing questions, and other actions. MSCS also developed software it licensed to Matrix to automate some of these Customer service function. Matrix used that software for the Plans' and all Class members.

47.     Defendant MSCS Financial Services Division of Broadridge Business Process Outsourcing, LLC ("MSCS Financial") is also owned by the same parent company as Matrix. MSCS Financial is incorporated under the laws of Delaware in or about 2001, with its principal place of business located at 717 17th Street, Suite 1300, Denver, Colorado 80202. Matrix contracted with MSCS Financial to perform services for the Plans and Class members. MSCS Financial collected, retained, and exercised control over 12b-1 fees at issue in this case without providing required disclosure. MSCS Financial is also a fiduciary to the Plans pursuant to ERISA 29 U.S.C. §§ 1002(21)(A), 1102(a)(1), 1103(a), because it, in fact, exercised authority and control over the management or disposition of the Plans' assets by retaining the Funds without disclosing them. MSCS Financial is also a service provider to the Plans and Class members as defined by the DOL because it entered into contracts with the Plans or for the Plans to perform services and expected compensation of over $1,000. 29 C.F.R. § 2550.408b-2(c)(1)(iii). MSCS Financial provided customer service support functions to the Plans' and Class members including expressly receiving 12b-1 fees as identified by Matrix.

**Appendix 015**

## VI.   <u>JURISDICTION</u>

48.     The Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(d)(2) as the aggregate value of the case is over $5,000,000 and several members of the putative class are citizens of a different state from the Defendant.

49.     The Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with the United States and with Texas to satisfy due process. ERISA allows for broad nationwide service of process on defendants in any district where they reside or may be found. *Id.* When a federal statute allows for nationwide service of process, the minimum contacts inquiry turns to whether the defendant has minimum contacts with the United States. *Bush v. Buchman, Buchman & O'Brien Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-03200-N, 2018 WL 2971135, at *1–2 (N.D. Tex. March 16, 2018); *Mba Eng'g, Inc. v. Vantage Benefits Adm'rs, Inc.*, No. 3:17-CV-3300-L (BK), 2019 U.S. Dist. LEXIS 106209, at *8 (N.D. Tex. March 5, 2019). Because Defendants are incorporated in Delaware and have their principal place of business in Colorado, Defendants have minimum contacts with the United States. *See Bush*, 11 F.3d at 1258; *Leaf Trading Cards*, 2018 WL 2971135, at *1–2. Moreover, Defendants do business in the state of Texas, including acting as the custodian for many Texas plans and hundreds of plans which are/were administered in Texas. Defendants have also not opposed personal jurisdiction in other cases in this District. *See Mba Eng'g*, 2019 U.S. Dist. LEXIS 106209, at *8.

## VII.   <u>VENUE</u>

50.     Venue properly lies in the Northern District of Texas pursuant to 29 U.S.C. § 1132(e)(2) for two reasons. First, this district is where many of the Class's ERISA plans were administered. 29 U.S.C. § 1132(e)(2). Over 100 ERISA qualified plans and Class members were

administered in the Northern District of Texas. *See* Def. Matrix's Answer and Counterclaims at ¶ 10, *Mba Eng'g, Inc. v. Vantage Benefits Adm'rs, Inc.*, No. 3:17-CV-3300-L (BK), (N.D. Tex. March 5, 2019) ("Matrix entered into Custodial Agreements with many of the more than 100 plans for which Vantage [a business located in the Northern District of Texas] acted as TPA").

51.     Second, for venue purposes, Defendants reside in this district. *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210 n.3 (10th Cir. 2000). Where a defendant resides for ERISA venue purposes, is wherever a defendant is subject to personal jurisdiction. *Id.*; *Frost v. ReliOn, Inc.*, No. 3:06-CV-0822-GECF, 2007 WL 670550, at *5–6 (N.D. Tex. March 2, 2007). Therefore, because ERISA allows for personal jurisdiction over a defendant that maintains minimum contacts with the United States, Defendants reside in Texas and venue is proper. *Frost*, 2007 WL 670550, at *5–6.

52.     This District Court has also already determined this district to be a proper venue for unrelated litigation between Plaintiffs and Matrix. *See Mba Eng'g*, 2019 U.S. Dist. LEXIS 106209, at *8.

## VIII.   CAUSES OF ACTION

### A.   COUNT I – ERISA PROHIBITED TRANSACTIONS
### (By Plaintiffs and the ERISA Classes against all Defendants)

53.     Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

54.     ERISA § 406(a–b) provides, in relevant part, that:

> (a)(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such a transaction constitutes a direct or indirect—
>
>  . . . .

**Appendix 017**

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. . .

(b) A fiduciary with respect to a plan shall not—

(1) Deal with the assets of the plan in his own interest or for his own account, . . . or

 . . .

(3) Receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(a–b) ("Prohibited Transactions").

55.     ERISA § 409 makes a fiduciary who breaches any of the fiduciary responsibilities under ERISA, including entering into a prohibited transaction, liable to the Plans for any losses sustained by the Plans, for any profits the fiduciary received from the Plans' assets, and any other equitable or remedial relief. 29 U.S.C. § 1109. These Prohibited Transactions were made to provide courts bright line rules and per se violations of ERISA fiduciary duties. *Donovan v. Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983).

56.     Fiduciary status under ERISA is to be construed liberally and is to be analyzed in light of the actions alleged. *Bannistor v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002). ERISA provides that an entity is a fiduciary if it "functions" as a fiduciary. 29 U.S.C. § 1002(21)(A). An entity functions as a fiduciary if it "exercises *any* authority or control respecting management or disposition of its assets." *Id.* (emphasis added).

57.     At all relevant times, Defendants were fiduciaries with respect to the Class. *Total Plan Servs., Inc. v. Texas Retailers Ass'n, Inc.*, 925 F.2d 142, 143 (5th Cir. 1991) (holding "All plan administrators, officers, trustees, and custodians are fiduciaries for purposes of ERISA" and citing 29 U.S.C. § 1002(14)(A)).

58.     The Class assets were held in accounts operated by Defendants. Each of the Class assets generated the Funds that Defendants unilaterally collected, retained, and/or disposed of under the claim of compensation. Under general property principals, interest and fees generated from assets are the property of the owners of the underlying assets; therefore, the Funds produced by the Class assets remain the property of the Class. Because Defendants were without any authority to retain and/or dispose of the fees and interest accrued, Defendants' actions constitute actual authority and control over the management and disposition of the Class assets—making Defendants functioning fiduciaries.

59.     Defendants entered into three (3) types of Prohibited Transactions by retaining the Funds, which were Class assets. *See* 29 U.S.C. § 1106(a-b). First, under ERISA § 406(a)(1)(D), a fiduciary is liable if it causes the direct or indirect transfer to, use by, or for the benefit of a party in interest of the plan assets. 29 U.S.C. § 1106(a)(1)(D). ERISA defines a "party in interest" as a fiduciary of a plan or a service provider of the plan. 29 U.S.C. § 1002(21)(a-b). Defendants in this case, as stated above, are functional fiduciaries and service providers because they provided custodial services to each Class member. Moreover, because the Funds are Class assets, retaining the Funds for the benefit of Defendants constitutes a prohibited transaction. Therefore, Defendants are liable to the Class for all of the Funds they retained as well as any profit that they derived from the Funds. Further, Plaintiffs expressly plead, in addition or in the alternative, that any payment of the Funds, or portions thereof, by Matrix to MSCS or any other party in interest, including third party administrators, constituted prohibited transactions for which Matrix cannot establish an exception and is therefore liable.

60.     Second, under ERISA § 406(b)(1), a fiduciary is prohibited from dealing with plan assets in its own interest. 29 U.S.C. § 1106(b)(1). By retaining the Funds or paying them to parties

in interest without disclosure, Defendants have kept the plan assets for themselves or exercised their own judgment as to their disposition. Because Defendants are fiduciaries and service providers to the Class members, Defendants entered into a prohibited transaction by dealing with Class assets in their own interest. Further, Defendants were never authorized to make these prohibited transactions.

61.     Third, under ERISA § 406(b)(3), a fiduciary is prohibited from receiving for itself any consideration from any party dealing with the plan from a transaction involving the assets of the plan. 29 U.S.C. § 1106(b)(3). Here, third parties paid Defendants the Funds that were generated from the Class assets. Defendants then retained the Funds for themselves. Because Defendants retained the Funds, they have received consideration for transactions involving plan assets—a prohibited transaction.

62.     Defendants have the burden to establish and cannot establish they meet an exemption from liability for a Prohibited Transaction because they did not disclose the existence, payment, or their retention of the Funds. ERISA § 408(b) removes certain transactions from the Prohibited Transaction list in § 406. 29 U.S.C. § 1108(b). The only potential exemption that would allow Defendants to retain the fees and interest is ERISA § 408(b)(2). 29 U.S.C. § 1108(b)(2). This section allows a fiduciary to enter into a contract with a party in interest for services for the plan if **no more than reasonable compensation is paid**. *Id.* (Emphasis added).

63.     However, compensation is per se not reasonable. Compensation will only be deemed reasonable if the fiduciary provides strict disclosures of the compensation. In 2012, the Department of Labor ("DOL"), pursuant to Congressional delegation and *Chevron* deference, determined that no compensation is reasonable if it is not disclosed to the ERISA plan. 29 C.F.R. § 2550.408b-2(c)(1)(i) ("No contract or arrangement for services between a covered plan and a

**Appendix 020**

covered service provider . . . is reasonable within the meaning of Section 408(b)(2) of the Act . . . unless the [disclosure] requirements of this paragraph (c)(1) are satisfied."). Compensation covered by this regulation includes 12b-1 fees, float interest, and non-float interest. *See* 29 C.F.R. § 2550.408b-2(c)(1)(i).

64.     To assist with disclosure requirements for ERISA fiduciaries and service providers, the DOL issued a Field Assistance Bulletin laying out several requirements for disclosing float income to avoid entering into a Prohibited Transaction. DOL Field Assistance Bulletin No. 2002-03. These requirements include: (1) disclosing "specific circumstances under which float will be earned and retained"; (2) establishing, disclosing, and adhering to specific time frames float cash will be invested; (3) disclosing when float period commences; and (4) disclosing the rate or manner of determining float interest rate. *Id.*

65.     Here, Defendants failed to make any disclosures of the 12b-1 fees, float interest, or non-float interest they retained. This includes Defendants' failure to follow the Department of Labor's Bulletin requirements. Additionally, Defendants presented inaccurate account statements to the Plaintiffs and Class members to make it appear that their assets did not generate any interest. This is false because the assets earned interest and Defendants kept it for themselves. Because Defendants did not disclose that they retained the Funds as compensation, this compensation is per se unreasonable. By retaining the Funds, Defendants entered into Prohibited Transactions that fall outside the protection of an exemption. Therefore, Defendants are liable to the Class for all of the Funds retained as well as any profits that were generated from the use of these Class assets.

**Appendix 021**

### B.     COUNT II – BREACH OF FIDUCIARY DUTY
### (By Plaintiffs and the ERISA Classes against all Defendants)

66.     Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

67.     As described above, the Class assets in Defendants' custody generated the Funds that Defendants in their sole authority collected, retained, and/or disposed of under the claim of compensation. Because Defendants lacked any authority to retain or dispose of the Funds, Defendants' actions constitute actual authority and control over the management and disposition of the Class assets, making Defendants functioning fiduciaries under ERISA. 29 U.S.C. § 1002(21)(A).

68.     Defendants breached their fiduciary duties under ERISA to act solely for the benefit of the Plans and to act with the "care, skill, prudence, and diligence" ERISA requires by retaining the Funds without disclosing the existence and retention of the Funds. 29 U.S.C. § 1104(a)(1).

69.     Defendants also failed to act solely in the interest of the participants and beneficiaries of the Plans and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA. *Id.*

70.     By retaining the Funds, Defendants acted against the best interest of the Plans by receiving compensation that was never disclosed or contemplated by the Plans. As fiduciaries, Defendants had an obligation to disclose that they had the right to receive fees and interest as compensation and the amount that they would retain on a consistent periodic basis.

71.     By failing to disclose the Funds that Defendants retained, Defendants breached their fiduciary duties causing the Class to lose millions of dollars. Defendants are liable to the Class under ERISA for all harm the Class has suffered as a result of Defendants' breaches.

**Appendix 022**

72.     As fiduciaries, Defendants may not disclaim any responsibilities under ERISA. 29 U.S.C. § 1110. Accordingly, any provision of the agreements which Defendants may contend relieves it of or limits its responsibility is invalid.

### C.     COUNT III – EQUITABLE RELIEF UNDER ERISA
### (By Plaintiffs and the ERISA Classes against all Defendants)

73.     Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

74.     Alternatively even if Defendants are not fiduciaries, an ERISA plan or fiduciary may seek restitution and other equitable relief from non-fiduciary parties in interest to prohibited transactions. 29 U.S.C. §§ 1106, 1132(a)(3); *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000); *Perez*, 823 F.3d at 272–75. If a non-fiduciary receives plan assets in violation of the prohibited transaction provision, the non-fiduciary will then be required to restore the plan assets to the plan and disgorge any profits derived from the plan assets. *Salomon*, 530 U.S. at 250.

75.     A party in interest includes somebody that provides services to an ERISA plan. 29 U.S.C. § 1002(14)(B). A service provider includes a custodian of plan assets who receives compensation for its services. 29 C.F.R. § 2550.408b-2(c)(1)(iii)(C).

76.     Defendants are service providers to each of the Class plans as they provided services for the Class assets. As service providers, Defendants are parties in interest to prohibited transactions.

77.     Non-fiduciary service providers, like fiduciaries, may not retain compensation without disclosing it to the applicable plan. 29 C.F.R. § 2550.408b-2(c)(1)(i) ("The requirements of this paragraph (c)(1) are independent of fiduciary obligations under section 404 of the Act."); DOL Field Assistance Bulletin No. 2002-03. Failure to disclose the compensation constitutes a

**Appendix 023**

prohibited transaction. 29 C.F.R. § 2550.408b-2(c)(1)(i); DOL Field Assistance Bulletin No. 2002-03.

78.     As stated above, Defendants retained or disposed of the Funds without disclosing that information to Plaintiffs or the Class. Because Defendants were service providers and failed to comply with ERISA disclosure requirements, the Class is entitled to all the Funds retained by Defendants as well as the profits earned on those Funds.

### D.     COUNT IV – STATE LAW BREACH OF FIDUCIARY DUTY
### (By Plaintiffs and the Non-ERISA Classes against all Defendants)

79.     Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

80.     For the Non-ERISA Classes, Defendants have breached their state law fiduciary duties.

81.     Defendants are fiduciaries to the Non-ERISA Class under statute. *See* Colo. Rev. Stat. §§ 15-1-507, 15-1-509, 15-1-510. Specifically, Defendants are Colorado trust companies who act as custodians. Because they are custodians, Defendants are deemed as fiduciaries. *Id.* § 15-1-507.

82.     Under statute, Defendants owed the Non-ERISA Class a duty to act reasonably and equitably with due regard to their obligations and responsibilities toward the interests of the beneficiaries.

83.     The property held by Defendants as custodians of the Class is fiduciary property. *Id.* Under general property law, all interest or fees generated from the principal remains the property of the principal. Because the Class assets generated the Funds, the Funds were also Class assets. By retaining the Funds for themselves or disposing of them, Defendants violated their fiduciary duty to the Class members.

84.     Moreover, Defendants are fiduciaries to the Non-ERISA Class under common law agency principles. Defendants were agents of the Class. Specifically, the agreements between the parties expressly provide for the agency relationship. As agents, Defendants are fiduciaries to the Class.

85.     As agents, Defendants owed the Non-ERISA Class multiple fiduciary duties. Those duties include: (1) to act with care, competence, and diligence normally exercised by agents in similar circumstances; (2) to take action only within the scope of actual authority; (3) to act reasonably and refrain from conduct likely to damage the Non-ERISA Class; (4) to use reasonable efforts to notify the Non-ERISA Class of material facts Defendants knew, had reason to know, or should have known; (5) to act loyally to the Non-ERISA Class's benefit; and (6) to act in accordance with the express and implied terms of the agency agreement.

86.     Defendants breached each one of these duties by retaining the fees and interest that rightfully belonged to the Non-ERISA Class. Moreover, Defendants knew that they were retaining the fees and interest that were generated by the Non-ERISA Class assets and never attempted to notify the Non-ERISA Class. By retaining the assets rightfully belonging to the Non-ERISA Class, Defendants damaged the Non-ERISA Class.

87.     As a result of these breaches, the Non-ERISA Class suffered harm by losing the Funds and the earnings that would have been generated by the Funds. Therefore, Defendants are liable to the Non-ERISA Class for all harm that they have suffered as a result of Defendants' breaches.

88.     Defendants' breaches also constitute willful and wanton conduct because they purposefully retained the Funds that belonged to the Non-ERISA Class. Accordingly, the Non-ERISA Class is entitled to exemplary damages. Colo. Rev. Stat. § 13-21-102.

**Appendix 025**

### E.   COUNT V – UNJUST ENRICHMENT
### (By Plaintiffs and all the Classes against all Defendants)

89.     Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

90.     Unjust enrichment is a state common law remedy that occurs when a person has wrongfully secured a benefit or passively received one which would be unconscionable to retain. *See Scott v. Scott*, 428 P.3d 626, 636 (Colo. Ct. App. 2018); *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The ERISA Class[2] also brings this claim in the alternative if the Court does not find that Defendants are a fiduciary. *See Smith v. Provident Bank*, 170 F.3d 609, 616–17 (6th Cir. 1999); *Sky Toxicology, Ltd. v. United Healthcare Ins., Co.*, 5-16-cv-01094-FB-RBF, 2018 U.S. Dist. LEXIS 150245, at *14–17 (W.D. Tex. Sept. 4, 2018); *Kersh v. United Healthcare Ins., Co*, 946 F. Supp. 2d 621, 638–39 (W.D. Tex. 2013).

91.     Under general and long-standing common law principles, interest and fees belong to the owner of the principal whereby they were generated. For instance, if a person owns $100 and that $100 generates $5 in interest, the person who owned the $100 also owns the $5. Here, the Class assets generated the Funds. Therefore, based on property law, the Class owns the Funds.

92.     However, Defendants retained the Funds. By retaining these Funds, Defendants deprived the Class of their rightful property. Because the Funds are the property of the Class, it would be unjust to allow the Defendants to remain in possession of the Funds. Therefore, the Funds retained by Defendants should be restored to the Class.

---

[2] Along with the Non-ERISA class.

**Appendix 026**

**F.    COUNT VI – CONVERSION**
**(by Plaintiffs and all the Classes against all Defendants)**

93.    Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

94.    The Class brings this claim for conversion against Defendants for the retention of the Funds. The ERISA Class also brings this claim in the alternative if the Court finds that Defendants were not fiduciaries. *See Smith*, 170 F.3d at 616–17; *Sky Toxicology,* 2018 U.S. Dist. LEXIS 150245, at *14–15; *Kersh*, 946 F. Supp. 2d at 638–39.

95.    Defendants wrongfully exercised dominion and control over property belonging to the Class. As stated above, the Funds are the property of the Class under general property rules that "interest follows principal." Defendants retained the Funds wrongfully and without authorization to do so.

96.    Therefore, the Class is entitled to restitution of the Funds held by Defendants that were generated from Class assets along with damages.

**G.    COUNT VII – MONEY HAD & RECEIVED**
**(by Plaintiffs and all the Classes against all Defendants)**

97.    Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

98.    The Class brings this claim for money had and received against Defendants for the retention of the Funds. The ERISA Class also brings this claim in the alternative if the Court finds that Defendants were not fiduciaries. *See Smith*, 170 F.3d at 616–17; *Sky Toxicology,* 2018 U.S. Dist. LEXIS 150245, at *14–15; *Kersh*, 946 F. Supp. 2d at 638–39.

99.    Defendants hold money that, in equity and good conscience, belongs to Plaintiffs. Specifically, the Funds under general property law belong to the Class. Defendants had no

**Appendix 027**

authority to retain these Funds and never disclosed that they were retaining the Funds. Also, Defendants affirmatively stated that the Class assets did not produce interest when in fact Defendants were retaining the interest.

100.     Therefore, in good conscience, the Plaintiffs are entitled to restitution of the Funds that Defendants retained from Class assets.

### IX.     <u>JURY DEMAND</u>

101.     Plaintiffs hereby demand, individually and on behalf of the Class members a trial by jury.

### X.     <u>DAMAGES</u>

WHEREFORE, Plaintiffs, on behalf of themselves and as representative of all others similarly situated, respectfully requests that this Court enter judgment as follows:

a.   Declaring that this action is properly maintainable as a class action;

b.   Certifying the Class according to the definitions above;

c.   Naming Plaintiffs' Counsel as Class Counsel;

d.   Naming Plaintiffs as Class Representatives;

e.   Awarding the Class the amount of 12b-1 fees, float interest, and non-float interest retained by Defendants to put Plans in the position they would have been in but for Defendants' improper self-compensation;

f.   Attorney's fees and other costs of court;

g.   Pre- and post-judgment interest; and

h.   Such other and further relief as this Court may deem just and proper.

**Appendix 028**

Respectfully submitted,

**McCathern, PLLC**

*/s/Justin N. Bryan*
Arnold Shokouhi
State Bar No. 24056315
arnolds@mccathernlaw.com
Justin N. Bryan
State Bar No. 24072006
jbryan@mccathernlaw.com
D. Aaron Dekle
State Bar No. 24100961
ddekle@mccathernlaw.com
3710 Rawlins Street, Suite 1600
Dallas, Texas 75219
Telephone: (214) 741-2662
Facsimile: (214) 741-1741

Evan Selik
*PRO HAC VICE APPLICATION FORTHCOMING*
California Bar No. 251039
eselik@mccathernlaw.com
523 West Sixth Street, Suite 830
Los Angeles, California 90014
Telephone: (213) 225-6150
Facsimile: (213) 225-6151

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

  I, the undersigned attorney, hereby certify that a true and correct copy of the foregoing was served on all counsel of record through the Court's CM/ECF system on October 21, 2021.

/s/*Justin N. Bryan*
Justin N. Bryan

# EXHIBIT B



## Fee Schedule and Disclosures

**INSERT PLAN NAME**
**(the "Plan")**

This fee schedule pertains to the services ("**Services**") covered in the Client Agreement with Matrix Trust Company ("**Matrix Trust**"), and is intended as the service provider disclosure statement to fiduciaries that have the authority to enter into, extend, or renew Matrix Trust's provision of services to the Plan.  If you are in receipt of this schedule and are <u>not</u> the responsible Plan fiduciary under 29 C.F.R. Sec. 2550.408b-2 ("**408(b)(2)**"), please forward this disclosure to that fiduciary's attention.

If Matrix Trust's appointment is as a directed (non-discretionary) trustee, with regard to providing services to the Plan, Matrix Trust is serving in a limited fiduciary capacity under ERISA.  If Matrix Trust's appointment is not as trustee, Matrix Trust is not serving in a fiduciary capacity under ERISA except to the extent that Matrix Trust explicitly agrees to and acknowledges its fiduciary capacity.

### TRUST/CUSTODY SERVICES

**Annual Market Value Fees:**
Plan With Total Assets of Less Than $25MM ........................... ▉ basis points
Plan With Total Assets of $25MM - $100MM .......................... ▉ basis points
Plan With Total Assets Over $100MM ..................................... ▉ basis point

Conditionally Accepted Assets[1] ............................................... ▉ basis points

**Annual Fees:**
Custodian Fee ....................................................................... $ ▉ per plan
Trustee Fee (includes custodial services) .................................. $ ▉ per plan
Separate Employer Accounts ................................................... $ ▉ per employer account

### DISBURSEMENT-RELATED SERVICES

Outgoing Bank Wire ............................................................... $ ▉ each
One Time Checks ................................................................... $ ▉ each
Recurring Checks ................................................................... $ ▉ each
ACH Transfers ....................................................................... $ ▉ each
Stop Payment ....................................................................... $ ▉ each
In-Kind Distribution ............................................................... $ ▉ each
Form 1099/W-2 ..................................................................... $ ▉ each
Form 1099/W-2 Replacement ................................................. $ ▉ each

### ADDITIONAL SERVICES

Unitization (readily priced securities) - Annual Fee[2]................. $ ▉ per NAV
Unitization  (hard to price securities) - Annual Fee ................. $ ▉ per NAV
1041 Tax Form ....................................................................... $ ▉ per form
Extraordinary Services ........................................................... $ ▉ per hour
Termination Fee ..................................................................... $ ▉ per plan
Self-Directed Brokerage Account (SDBA):
    Initial Account Set-Up ...................................................... $ ▉ each
    Annual Fee @ connected broker ........................................... $ ▉ each (in addition to the Annual Market Value Fees listed above)
    Annual Fee @ non-connected broker ................................... $ ▉ each (in addition to the Annual Market Value Fees listed above)

---

[1] Please refer to the Operational Guidelines in the Client Agreement for complete details.
[2] Account must be maintained at a "connected" brokerage firm or consist of eligible daily valuation compliant investment options.

7/14/2021
Matrix ▉ Fee Schedule 020121

**Appendix 030**   DEF_00002881



## TERMS, CONDITIONS AND REQUIRED DISCLOSURES

The Plan's third-party administrator may impose administration fees, which are in addition to the afore-mentioned fees. The afore-mentioned fees do not include investment manager or consultant fees. The afore-mentioned fees do not include any brokerage or other sub-custodian commissions, unless otherwise noted. The afore-mentioned fees also do not include mutual fund sales charges/loads or brokerage commissions imposed by broker-dealers or mutual fund families. An applicable mutual fund prospectus or statement of additional information may provide for the waiver of plan level mutual fund sales charges/loads. In order for the fees to be included, the Plan Sponsor or the Responsible Plan Fiduciary or a person identified by the Plan Sponsor or the Responsible Plan Fiduciary to act as the Authorized Person (the "**Authorized Person**") may be required to complete additional documentation. The afore-mentioned fees also do not include real estate appraisal fees, annual inspection costs, insurance premiums or other like costs associated with any real property that may be held in the account.

The fees listed in the Trust/Custody Services section are charged on a per plan basis and include:
• Electronically transmitted transactions    • Asset transfer and set-up in one account per plan
• Quarterly and annual statement (maximum of two duplicate sets)    • Proxy delivery to the Plan Sponsor or other designated party
• Wire receipts for employer and employee contributions and master note loan repayments (if applicable)
• Interest, dividend, and capital gains posting; processing of capital changes (splits, reorganizations, etc.)

Additional fees may be charged for:
• Extraordinary services    • Checks received with insufficient funds    • Overnight mailing ($25 per mailing)
• Administration of special assets, including transaction and outgoing wire charges for special assets

*Fees are billed quarterly in advance.* To the extent fees are asset based, fees will be calculated utilizing a daily average balance for the previous invoice period. Fees shall be paid by the account, unless otherwise directed by the Plan Sponsor or Authorized Person. To the extent Matrix Trust fees are paid by the account, the fees represent direct compensation paid to Matrix Trust. To the extent that Matrix Trust fees are paid by the Plan Sponsor and not reimbursed by plan assets, the fees do not represent direct or indirect compensation paid to Matrix Trust for purposes of 408(b)(2). Matrix Trust fees outstanding for more than 90 days from the billing date may be deducted directly from the account.

I.   **INDIRECT COMPENSATION**

Matrix Trust may receive indirect compensation in connection with Services:
• in the form of "float" income
• through its affiliate(s) and/or other parties as described below, and to the extent applicable, with respect to Investment Related Administrative Fee Services, Brokerage Accounts, Retirement Cash Account, ModelTool(K)it™, Level Compensation Services, ETF/Closed End Fund Trading Services, Stale Dated Check Services, and Proceeds of Corrective Transactions.

A.   **CASH SUB-ACCOUNTING SERVICES/FLOAT INCOME**

Matrix Trust also provides sub-accounting services to certain banking institutions, with respect to cash held on a short-term basis in their omnibus accounts. With respect to the Plan, this may occur where, for example, Plan funds are awaiting investment, distribution or other processing. As described below under the section titled: "Matrix Trust - Float Disclosure for Employee Benefit Plans," Matrix Trust may derive compensation from the use of this short-term cash, which is referred to as "float income". Currently, Matrix Trust has arrangements with two banks – JP Morgan Chase and TD Bank – under which the banks pay float income to Matrix Trust in exchange for its sub-accounting services. Float income is reflected as an earnings credit or service fee on monthly bank invoices.

The exact amount of float income credited from these two banks to Matrix Trust cannot be described in precise terms, because the rate of float income paid fluctuates over time (it generally tracks the Federal Funds Rate), and it is also impossible to predict exactly how much Plan cash will be held on a short-term basis, and for how long. Please refer to the section below titled "Matrix Trust - Float Disclosure for Employee Benefit Plans" for more information.

B.   **MATRIX TRUST - FLOAT DISCLOSURE FOR EMPLOYEE BENEFIT PLANS**

1.   **Additional Compensation Attributable to Float**

Matrix Trust may derive compensation from the use of cash held on behalf of client plans pending investment, distribution or other processing. This compensation is referred to as "float". The disclosures contained in the following paragraphs have been prepared in accordance with U.S. Department of Labor guidance contained in Field Assistance Bulletin 2002-3 concerning service provider float disclosure obligations to employee benefit plan customers.

7/14/2021



**Appendix 031** _00002882



In connection with Matrix Trust's provision of services to plan customers, Matrix Trust maintains various banking arrangements to facilitate movements of cash as necessary to process plan customer transactions, including arrangements with one or more banks.  Under these arrangements, cash may be held in general or "omnibus" bank accounts established by or at the direction of Matrix Trust, pending investment, trade settlement, or the presentment of distribution checks for payment.  These accounts generate float earnings for Matrix Trust.   The proportionate share of those earnings attributable to the funds of a particular plan constitutes compensation that is paid by the plan and retained by Matrix Trust in connection with Matrix Trust's services and is in addition to any other fees or compensation payable under the service arrangement.

As of the date of this disclosure, Matrix Trust's only banking arrangements described above are with JPMorgan Chase, N.A. and TD Bank, N.A, both of which are unaffiliated institutions to Matrix Trust.

The paragraphs below describe the specific circumstances under which float will be earned and retained, the time frames applicable to float earnings periods, and a general description of the rate of float earnings.

2. **Circumstances and Time Frames During Which Float May Be Earned**
   a) **Contributions**
   Plans direct cash contributions to Matrix Trust through a demand deposit account Matrix Trust maintains for that purpose.  Matrix Trust credits the amount of a plan's cash contribution to the plan's Matrix Trust account ("**Client Account**") on the business day it is received.  If the Client Account uses a cash sweep, the cash contribution is swept from the demand deposit account and invested on the plan's behalf on the next business day.  Matrix Trust earns float on the cash contribution between the business day of deposit and the next business day.  A "business day" is a day on which the New York Stock Exchange is open for business.

   If a Client Account does not use a cash sweep, Matrix Trust earns float on the cash contribution from the business day of deposit until Matrix Trust receives investment instructions from the plan and the investment transaction settles.  Upon Matrix Trust's receipt of investment instructions in good order, settlement of mutual fund trades generally occurs within one business day and settlement of individual securities trades (*i.e.,* stocks and bonds) generally occurs within three business days.

   b) **Purchases of Securities for the Client Account**
   When Matrix Trust receives instructions, in good order and in accordance with prescribed procedures, to purchase a security for a Client Account, Matrix Trust places the purchase trade order that same business day if the instructions are received prior to Matrix Trust trading cut-off times.  If instructions are received after the Matrix Trust trading cut-off times, the purchase trade order is placed on the next business day.

   When Matrix Trust settles a purchase trade order for a Client Account, Client Account assets required to pay for the purchase are transferred to a demand deposit account maintained by Matrix Trust on the trade settlement date.  When a purchase trade order is cancelled or rejected, the funds previously set aside to pay for the purchase are re-credited to the Client Account and either invested through the cash sweep, if applicable, or retained in the deposit account pending other investment instructions, as described above.

   c) **Sales of Securities for the Client Account**
   When Matrix Trust receives instructions, in good order and in accordance with prescribed procedures, to sell a security for a Client Account, Matrix Trust places the sale trade order that same business day if the instructions are received prior to Matrix Trust trading cut-off times.  If instructions are received after the Matrix Trust trading cut-off times, the sale trade order will be placed on the next business day.

   When Matrix Trust places or settles a sale trade for a Client Account, the Client Account receives the sales proceeds on the trade settlement date.  If the Client Account does not use a sweep, Matrix Trust will earn float from the date Matrix Trust receives the sale settlement proceeds until Matrix Trust receives instructions to reinvest the sale proceeds as described above.

   d) **Payments from Client Accounts**
   Matrix Trust may earn float when it issues checks on behalf of plans including checks for (i) distributions to participants and/or beneficiaries, (ii) participant loan distributions, or (iii) fees paid to plan service providers.

7/14/2021
Matrix ▮▮▮ Fee Schedule 020121

**Appendix 032**
DEF_00002883



Matrix Trust does not earn float when payments or distributions are made by direct deposit (ACH) or by a federal funds wire transfer.

Matrix Trust will mail a distribution check to a plan participant or beneficiary on the payable date (the date printed on the check). On the same day, Matrix Trust debits the Client Account in the amount of the check. Matrix Trust will earn float on the amount of the check from the date the check is issued until the date the check is presented and paid.

Where Matrix Trust has been directed to establish periodic or recurring distribution checks, such payments are typically mailed to plan participants and beneficiaries prior to the payable date (for example, periodic payments are mailed six business days prior to the payable date). Matrix Trust debits the Client Account in the amount of the checks on the payable date. Matrix Trust is able to mail the checks before assets are withdrawn from the Client Account and sold because periodic distributions are of a predictable amount (generally a set dollar amount each payment cycle). Matrix Trust will only earn float on the amount of the check from the date the check is payable until the date check is presented and paid.

On a periodic basis, Matrix Trust will notify clients of outstanding periodic and lump sum distribution checks that Matrix Trust has issued. If an originally-issued check is reported lost or missing, Matrix Trust will re-issue the check upon receipt of direction from the client and/or other authorized party to instruct on the account. If the participant or beneficiary does not negotiate the check within a reasonable time, Matrix Trust reserves the right to re-credit (redeposit) the payment to the Client Account and to invest these funds at the direction of a Client Account fiduciary, or to disburse the funds as directed or otherwise in accordance with applicable law.

**3. Rate On Float Earnings**

The rate at which Matrix Trust earns float over the time periods described above is generally comparable to the effective Federal Funds Rate as reported in the Wall Street Journal over the applicable time frame.

**C. <u>INVESTMENT RELATED ADMINISTRATIVE FEE SERVICES</u>** (if elected and to the extent applicable)

Where Matrix Trust has been so authorized, Matrix Trust through its affiliate and registered broker dealer, MSCS Financial Services Division of Broadridge Business Process Outsourcing, LLC ("**MSCS Financial**"), may receive fees from certain investment companies, mutual funds, stable value funds, guaranteed investment contracts, guaranteed annuity contracts and similar investment vehicles (the "**Funds**") in the form of 12b-1 fees or firm concessions (*i.e.,* finders fees), or in the form of shareholder servicing, sub-transfer agent and sub-accounting fees ("**Mutual Fund Fees**").

In accordance with the Administrative Fee Collection Addendum, Matrix Trust may deposit an amount equal to a percentage (or percentages) of the Mutual Fund Fees collected to an Administrative Fee Account for the administrative services provided to the Plan ("**Administrative Fees**"). The Administrative Fees will remain in the Administrative Fee Account until Matrix Trust is instructed to disburse it.

MSCS Financial is compensated by the collection of Mutual Fund Fees. In accordance with an intercompany agreement between MSCS Financial and Matrix Trust, MSCS Financial pays to Matrix Trust the Administrative Fee, which Matrix Trust, in turn, pays out in accordance with the Administrative Fee Collection Addendum. MSCS Financial may retain for its services an amount up to ██% of Mutual Fund Fees collected.

Administrative Fees are generated only to the extent the following are all true:

- the Plan has selected its investment options from those that are available on the Matrix Trust platform;
- the Plan has holdings in investment options which generate Mutual Fund Fees; and
- the Plan Sponsor or Authorized Person has authorized Matrix Trust, through its affiliate, to collect the Mutual Fund Fees.

If the Plan is trading on Matrix Trust's trading platform and Mutual Fund Fees are available for the plan investment options selected for the Plan, available Mutual Fund Fees are identified on the Plan fund list in the Sub-TA and 12b-1 columns for each investment option listed and is paid by the investment provider offering the fund.



**Appendix 033**
DEF_00002884



**D.**   **CERTAIN BROKERAGE ACCOUNTS** (if elected and to the extent applicable)

If the Plan offers a self-directed brokerage account ("**SDBA**") option to Plan participants, SDBA balances remain subject to the services and fees described under other sections of this schedule, to the extent applicable.

Also, where the named Fiduciary of the Plan and/or its authorized representative(s) has directed Matrix Trust to establish an SDBA that is a TD Ameritrade Brokerage Account, pursuant to an agreement with TD Ameritrade, Matrix Settlement and Clearing Services, LLC ("MSCS") will provide account reconciliation services, account set-up and maintenance, movement of cash between the Plan's core accounts and SDBAs, and related administrative tasks.  For these services and others, MSCS will receive quarterly, in arrears, an amount equal to ▮▮▮▮ (▮▮▮ basis points) of the value of Plan assets in the TD Ameritrade SDBAs during such quarter, based on the average of the Plan assets held in the SDBAs on the last business day of each month in the applicable quarter.  This rate shall apply for the calendar quarter ending March 2020 and shall decrease as follows to ▮▮▮% (▮ basis point) for the calendar quarter ending June 2020, then ▮▮▮% (▮▮ basis points) for the calendar quarter ending September 2020, then ▮▮▮% (▮▮ basis points) for the calendar quarter ending December 2020 with subsequent quarters to be calculated at the rate of ▮▮▮% (▮▮▮ basis points).  TD Ameritrade pays these fees to MSCS.

In all cases, the fees described above do not include brokerage commissions or other fees payable to TD Ameritrade, or other SDBA provider, who are unaffiliated with Matrix Trust, MSCS and MSCS Financial.

**E.**   **RETIREMENT CASH ACCOUNT** (if elected and to the extent applicable)

Matrix Trust receives fees with respect to the Retirement Cash Account, to the extent permitted by Applicable Rules, for providing services with respect to the account and the accountholders.  Specifically, as provided under an agreement with JPMorgan Chase Bank, N.A. ("**JPMCB**"), Matrix Trust receives a servicing fee in exchange for providing sub-accounting and support services, processing transactions and reconciling aggregate account activity with respect to funds deposited in the Retirement Cash Account with JPMCB.  The servicing fee is deducted by Matrix Trust from the total interest paid to Matrix Trust by JPMCB, and is the difference between the total interest rate paid to Matrix Trust by JPMCB and the stated interest rate paid to plan participants on their investments in the Retirement Cash Account.  In other words, the servicing fees paid to Matrix Trust reduce the interest rate paid to plan participants by a corresponding amount.

At each rate of total interest paid by JPMCB (from 0.00% up to 5.00%), the share of such total interest that is credited as the "stated rate" of interest to plan participants on their Retirement Cash Account balances, and the share of such total interest that is retained by Matrix Trust as its servicing fees, are set forth under a pre-established rate table.  Such servicing fees are based on the average daily deposit balances in the Retirement Cash Account.  The rate of the servicing fee that Matrix Trust receives may exceed the interest rate or effective yield the depositors receive from the Retirement Cash Account.  No portion of these servicing fees will reduce or offset the fees otherwise due to Matrix Trust unless required by Applicable Rules.  "Applicable Rules" means all applicable federal and state laws, rules and regulations, rules of any self-regulatory organization, and the constitution and applicable rules, regulations, customs, and usages of the exchange or market and its clearinghouse.  Unless stated otherwise in Schedule 1, other than the applicable fees charged on plan custody accounts, there are no separate charges, fees (other than the servicing fee described above), or commissions paid to Matrix Trust or its affiliates as a result of, or otherwise in connection with, the Retirement Cash Account.

For more specific information, the current interest rate payable at any given time will be available online at: https://www.broadridge.com/resource/matrix-trust-company.

A copy of the full rate table and the current interest rate payable at any given time may be obtained by calling Matrix Trust Client Services at 888-947-3472.

Current Retirement Cash Account disclosures and rates payable are likewise available online at: https://www.broadridge.com/_assets/pdf/broadridge-msb-retirement-cash-account.pdf.

As of February 1, 2021, the total rate of interest being paid by JPMCB is 0.20% (20 basis points), and as provided in the rate table, this means that Matrix Trust's servicing fees are equal to 0.15% (15 basis points).  However, as the total interest rate paid by JPMCB increases, the servicing fees will likewise increase, and if the total interest rate paid by JPMCB decreases, the servicing fees will likewise decrease.  While the full rate table is available and accessible (as explained above), it is very voluminous.  However, the following summarizes the general ranges of the stated interest rates paid to Plan participants and Matrix Trust's servicing fees at various rates of total interest, as determined under the rate table:



| When the total rate of interest paid (annually) by JPMCB is between: | The stated interest rate paid to plan participants ranges from: | The servicing fees retained by Matrix Trust ranges from: |
|---|---|---|
| 0.00% and 0.50% | 0.00% and 0.13% | 0.00% and 0.37% |
| 0.51% and 1.00% | 0.13% and 0.25% | 0.38% and 0.75% |
| 1.01% and 2.00% | 0.26% and 0.50% | 0.75% and 1.50% |
| 2.01% and 3.00% | 0.51% and 1.23% | 1.50% and 1.77% |
| 3.01% and 4.00% | 1.23% and 1.90% | 1.78% and 2.10% |
| 4.01% and 5.00% | 1.91% and 2.63% | 2.10% and 2.37% |

Based upon the total rates of interest paid by JPMCB in recent periods, and the total rates of interest that Matrix Trust generally expects that JPMCB would intend to pay in the future, a reasonable estimate of the servicing fees retained by Matrix Trust would usually be between 0% and 2.37%. However, we should emphasize that Matrix Trust cannot control or predict the total interest rates payable by JPMCB in the future, which makes it impossible to predict the rate of Servicing Fees we will receive at any given time. Therefore, to help you make a fully informed decision about whether to utilize (or continue utilizing) the Retirement Cash Account at any given time, we strongly recommend that you access the online materials or contact Matrix Trust Client Services as described above, to be provided with more detailed information.

**F.   MODELTOOL(K)IT™SERVICES** (if elected and to the extent applicable)
Where the named Fiduciary of the Plan and/or its authorized representative(s) has entered into an agreement to subscribe to ModelTool(k)it™ ("**MTK**") for the Plan, a total annual fee of ▇▇% (▇▇ basis points), the ModelTool(k)it™ Platform Fee, charged monthly in arrears applies to the market value of assets covered under the MTK agreement.  This fee is deducted directly from the Plan account from the assets covered under the MTK agreement.  Of the total fee, a third-party subcontractor of MSCS, Envestnet Retirement Services ("**ERS**") receives approximately (no less than) ▇▇% (▇▇ basis points) as its compensation for providing services detailed in the Plan's MTK agreement, and MSCS itself will retain approximately (no more than) ▇▇% (▇▇ basis points) for facilitating MTK as a service on the MSCS trading platform.  All other applicable services and fees will continue to apply, except that if investments subject to the MTK agreement generate Mutual Fund Fees, MSCS Financial will collect such Mutual Fund Fees as compensation, but Matrix Trust will credit back Administrative Fees in an amount equal to one hundred percent (100%) of such Mutual Fund Fees to the TPA.

**G.   LEVEL COMPENSATION SERVICES** (if elected and to the extent applicable)
Where the named Fiduciary of the Plan has engaged a broker (registered representative) whose firm utilizes the Matrix Trust Level Compensation Services, in addition to any other applicable services and fees, MSCS Financial will serve as Broker of Record for investment transactions, and will retain up to ▇▇% (▇▇ basis points) of the Plan's total assets, with such fees coming from any 12b-1 fees and shareholder servicing ("**Level Compensation Fees**") it collects from Funds on behalf of the broker.  For certain Plans whose investment lineup pays differing compensation per investment, brokers may receive Level Compensation Fees based on an approximate weighted average ("**Weighted Average**") of fees paid by or on behalf of Funds.  Where Weighted Average is in place, MSCS Financial may retain an overage in the amount fees received from or on behalf of the Funds.  This overage amount may be an amount up to ▇▇% (▇▇ basis points) of Plan assets because Weighted Average Level Compensation Fee percentages are set by MSCS on ▇▇% (▇▇ basis point) increments.  If you have engaged an investment adviser for your plan whose firm utilizes the RIA Remittance Services of the MSCS Level Compensation Services, in addition to any other applicable services and fees, MSCS will be paid a fee of up to ▇▇% (▇▇ basis points) of the Plan's total assets (also referenced as **"Level Compensation Fees"**).  With respect to brokers, the Level Compensation Fees are in exchange for MSCS Financial's administrative services in collecting and distributing Level Compensation Fees to the broker.  With respect to investment advisers, the Level Compensation fees are in exchange for MSCS's administrative services in collecting from the TPA and distributing to the investment adviser the adviser's advisory fees (*i.e.,* facilitating RIA fee remittance services).  Per the agreement setting forth the Level Compensation Services between MSCS and the broker-dealer or investment advisory firm, this compensation is deducted from Level Compensation Fees as received from the Plan's Funds.

**H.   ETF/CLOSED END FUND TRADING SERVICES** (if elected and to the extent applicable)
In addition to all other applicable services and fees, if the Plan offers one or more exchange-traded funds ("**ETFs**") and/or closed end funds ("**CEFs**") as investment options to Plan participants, a third-party subcontractor of MSCS, Virtu Americas



LLC ("**Virtu**") (formerly known as "**Knight Capital Group**" or "**KCG**") receives certain commissions for executing ETF/CEF trades processed on the MSCS trading platform (per the agreement between Matrix Trust/MSCS and the TPA). Per the agreement between Matrix Trust/MSCS and the TPA, the commissions paid to Virtu are generally deducted directly from the Plan account *(i.e.,* "netted" from the ETF/CEF trade) unless, per the agreement between Matrix Trust/MSCS and the TPA, the TPA is invoiced for such charges instead. Virtu's commission charges, as the executing ETF/CEF broker, are:

- $▮▮▮ per share per ETF/CEF trade received by MSCS prior to 3:00 pm Eastern Time, or one (1) hour prior to market close, with market on close execution; or
- $▮▮▮ per share per ETF/CEF trade processed during market hours (with pricing changing throughout the trading day).

MSCS (along with Matrix Trust and MSCS Financial) does not retain any of Virtu's commissions described above; rather, Virtu receives 100% of these additional ETF/CEF commissions. However, Virtu's commissions are in addition to, not in lieu of, all other applicable fees, including but without limitation the Administrative Fees described above under the heading "Investment Related Administrative Fee Services".

ETF/CEF trade instructions may be received by MSCS after market close. When this occurs, the transaction will be processed the following business day. Because the price of an investment may change between the receipt of instructions and the execution of instructions, a transaction may result in either a shortfall or an excess. If the transaction results in a shortfall, Matrix Trust will promptly cover the shortfall to the extent necessary to process the transaction based on the price that would have been paid or realized by the Plan had the transaction been processed on the day Matrix received instruction. If the transaction results in an excess, Matrix Trust will retain the amount of the excess in a suspense account to be applied to future shortfalls.

**I.   STALE DATED CHECK SERVICES**

Matrix Trust provides services to assist with the resolution of Plan participants' stale dated checks, as directed by an Authorized Person. Where the named Fiduciary of the Plan and/or its authorized representative(s) has elected to utilize certain services to assist in the resolution of participant related stale dated checks, a subcontractor to Matrix Trust and MSCS, PBI Research Services, Pension Benefit Information, LLC ("**PBI**"), receives $▮▮ per check as direct compensation which is deducted directly from the Plan *(i.e.,* from the stale check amount). This compensation to PBI is for its services which includes conducting a search, related communications, and distributing funds to affected Plan participants. All float income to Matrix Trust will cease with respect to the stopped check from the time the check is stopped, but float income related to the period beginning with the issuance of the distribution check through the date the check was stopped will be retained by Matrix Trust.

**J.   PROCEEDS OF CORRECTIVE TRANSACTIONS**

Matrix Trust receives investment instructions and, although rare, occasional errors in the instructions themselves or the processing of instructions may occur. The causes of such errors may include, but are not necessarily limited to, entry of an erroneous trade ("buy" vs. "sell," or vice versa), dollar amount or number of shares, incorrect identification of the security, duplication of orders (such as, instructions entered more than once), or untimely transmittal of instructions. When an error is discovered, action is taken to correct the transaction in a manner intended to avoid or minimize harm or disruption to the Plan. Because the price of an investment may change between the processing of erroneous instructions and the execution of corrective instructions, a corrective transaction may result in either a shortfall or an excess. If the error originates with Matrix Trust and the corrective transaction results in a shortfall, Matrix Trust will promptly cover the shortfall to the extent necessary to process the transaction based on the price that would have been paid or realized by the Plan had the transaction been processed as instructed. If the corrective transaction results in an excess, Matrix Trust will retain the amount of the excess in a suspense account to be applied to future shortfalls resulting from trade errors. Consistent with positions expressed by the U.S. Department of Labor, any such excess proceeds may be treated as compensation to Matrix Trust for its services. The amount of any such compensation cannot be predicted in advance, but generally is not expected to be material over time.

**II.   NON-MONETARY COMPENSATION**

Matrix Trust and MSCS Financial maintain policies that place limits on the circumstances under which gifts, travel and entertainment may be accepted by employees. Other than for modest gifts given or received in the normal course of business, employees are not permitted to receive gifts from clients and vendors. Under the 408(b)(2) regulation, a service provider's acceptance of these non-monetary items may involve the receipt of indirect compensation from a plan where the value





attributable to the plan, on a pro rata basis, exceeds $250 over the term of the plan's contract with the service provider.  In light of the policies, Matrix Trust does not anticipate that the value of any such non-monetary items will approach the $250 threshold with respect to the plan.

**III.**   **MISCELLANEOUS**

Matrix Trust reserves the right to decline acceptance of any Plan assets not discussed during the original account acceptance process.  Matrix Trust reserves the right to amend this fee schedule at any time with a 30 day advance written notice to the Plan Sponsor, or such other time period as specified within the Client Agreement covering the Services.


**ACKNOWLEDGED AND AGREED TO BY:**


_____
Authorized Representative's Signature                    Date


_____
Authorized Representative's Name (please print)          Title


_____
Company Name

7/14/2021
Matrix ▮▮▮▮ Fee Schedule 020121

**Appendix 037**

DEF_00002888

# EXHIBIT C



**BrokerCheck Report**

# BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

CRD# 114212

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Firm Profile | 2 - 8 |
| Firm History | 9 |
| Firm Operations | 10 - 16 |


Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.
For more information read our investor alert on imposters.

**About BrokerCheck®**



BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

· **What is included in a BrokerCheck report?**
·     BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
·     Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
· **Where did this information come from?**
·     The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    o   information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    o   information that regulators report regarding disciplinary actions or allegations against firms or brokers.
· **How current is this information?**
·     Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
· **What if I want to check the background of an investment adviser firm or investment adviser representative?**
·     To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
· **Are there other resources I can use to check the background of investment professionals?**
·     FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
·

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

**Appendix 039**

www.finra.org/brokercheck



## BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

CRD# 114212

SEC# 8-53412

### Main Office Location

300 EXECUTIVE DRIVE
SUITE 1
EDGEWOOD, NY  11717-8382
Regulated by FINRA Long Island Office

### Mailing Address

300 EXECUTIVE DRIVE
SUITE 1
EDGEWOOD, NY  11717-8382

### Business Telephone Number

201-793-9304

## Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

### Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Delaware on 04/06/2001.

Its fiscal year ends in June.

### Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

### Firm Operations

**This firm is registered with:**

- the SEC
- 1 Self-Regulatory Organization
- 5 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?  **No**

This firm conducts 3 types of businesses.

This firm is not affiliated with any financial or investment institutions.

This firm has referral or financial arrangements with other brokers or dealers.

### Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?     **No**

**Appendix 040**     1

www.finra.org/brokercheck

# Firm Profile



This firm is classified as a limited liability company.

This firm was formed in Delaware on 04/06/2001.

Its fiscal year ends in June.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC**
**Doing business as BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC**
**CRD#**   114212
**SEC#**   8-53412

**Main Office Location**

300 EXECUTIVE DRIVE
SUITE 1
EDGEWOOD, NY  11717-8382
**Regulated by FINRA Long Island Office**

**Mailing Address**

300 EXECUTIVE DRIVE
SUITE 1
EDGEWOOD, NY  11717-8382

**Business Telephone Number**

201-793-9304

## Other Names of this Firm

| Name | Where is it used |
|---|---|
| LTX | NY |
| MSCS FINANCIAL SERVICES | CO |

©2021 FINRA. All rights reserved.    Report about BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

**Appendix 041**    2

**Firm Profile**

User Guidance



This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BROADRIDGE BPO HOLDING LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | SOLE MEMBER |
| **Position Start Date** | 04/2020 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |
| **Legal Name & CRD# (if any):** | ALEXANDER, MICHAEL JAY |
| | 1428753 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CEO/PRESIDENT/ MANAGER ON THE BOARD OF MANAGERS |
| **Position Start Date** | 07/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |
| **Legal Name & CRD# (if any):** | BEHAR, ADAM SAMUEL THEODOR |
| | 4901369 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | GENERAL COUNSEL/ MANAGER ON THE BOARD OF MANAGERS |
| **Position Start Date** | 01/2013 |

# Firm Profile

**FINRA**

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | CASS, ALBERT JOHN LLL |
| | 2182652 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | VICE PRESIDENT |
| **Position Start Date** | 08/2020 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DASH, CYNTHIA BETH |
| | 4426516 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER ON THE BOARD OF MANAGERS |
| **Position Start Date** | 02/2017 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | DEONIER, CHRISTIAN WILLIAM |

©2021 FINRA. All rights reserved.   Report about BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

**Firm Profile**



User Guidance

## Direct Owners and Executive Officers (continued)

|  | 2829240 |
|---|---|
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | SENIOR VICE PRESIDENT |
| **Position Start Date** | 07/2015 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| **Legal Name & CRD# (if any):** | FISCHER, CEDRIC DAMON |
|---|---|
|  | 2795905 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | DIRECTOR OF COMPLIANCE, ANTI-MONEY LAUNDERING COMPLIANCE OFFICER |
| **Position Start Date** | 09/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | Yes |

| **Legal Name & CRD# (if any):** | PERRY, CHRISTOPHER JOHN |
|---|---|
|  | 1841603 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER ON THE BOARD OF MANAGERS |
| **Position Start Date** | 02/2017 |
| **Percentage of Ownership** | Less than 5% |

**Firm Profile**



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | PORT, JAMES EDWARD |
| | 2366427 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF COMPLIANCE OFFICER |
| **Position Start Date** | 06/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | Yes |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SAX, CHARLES EDMOND |
| | 1821188 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF FINANCIAL OFFICER / VP / TREASURER / FINOP |
| **Position Start Date** | 01/2013 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | TOFFEY, JAMES WORDEN |
| | 1512327 |

©2021 FINRA. All rights reserved.    Report about BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

**Firm Profile**

User Guidance



## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MANAGER ON THE BOARD OF MANAGERS |
| **Position Start Date** | 01/2020 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BROADRIDGE FINANCIAL SOLUTIONS, INC. |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Company through which indirect ownership is established** | BROADRIDGE BPO HOLDING LLC |
| **Relationship to Direct Owner** | SHAREHOLDER |
| **Relationship Established** | 03/2007 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | Yes |

www.finra.org/brokercheck

**Firm History**



This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2021 FINRA. All rights reserved.    Report about BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

**Appendix 048**

# Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 5 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 01/02/2002 |

## SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:    Yes

A broker-dealer and government securities broker or dealer:    No

A government securities broker or dealer only:    No

This firm has ceased activity as a government securities broker or dealer:    No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 01/02/2002 |

**Firm Operations**



## Registrations (continued)

| U.S. States & Territories | Status | Date Effective |
|---|---|---|
| California | Approved | 08/31/2020 |
| Colorado | Approved | 01/04/2002 |
| New Jersey | Approved | 02/14/2013 |
| New York | Approved | 01/23/2013 |
| Texas | Approved | 08/18/2021 |

# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 3 types of businesses.**

### Types of Business

Broker or dealer retailing corporate equity securities over-the-counter

Mutual fund retailer

Other - OPERATIONS SUPPORT / OUTSOURCING SERVICES - TRANSACTIONAL PROCESSING

MUTUAL FUND PROCESSING (MSCS FINANCIAL SERVICES)

INTERACTIVE DATA AND ELECTRONIC SYSTEM AND COMMUNICATIONS PLATFORM FOR SECURITIES, DERIVATIVES AND OTHER INTERESTS (LTX)

### Other Types of Business

This firm does not effect transactions in commodities, commodity futures, or commodity options.

This firm does not engage in other non-securities business.

Non-Securities Business Description:

## Firm Operations



### Clearing Arrangements

**This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).**

### Introducing Arrangements

**This firm does refer or introduce customers to other brokers and dealers.**

| | |
|---|---|
| **Name:** | APEX CLEARING CORPORATION |
| **CRD #:** | 13071 |
| **Business Address:** | ONE DALLAS CENTER<br>350 N. ST. PAUL, SUITE 1300<br>DALLAS, TX  75201 |
| **Effective Date:** | 06/13/2014 |
| **Description:** | CLEARING AGREEMENT ON A FULLY DISCLOSED BASIS |

**Firm Operations**

**Industry Arrangements**



**This firm does have books or records maintained by a third party.**

| | |
|---|---|
| **Name:** | PROOFPOINT, INC. |
| **Business Address:** | 925 WEST MAUDE AVENUE<br>SUNNYVALE, CA  94085 |
| **Effective Date:** | 04/27/2021 |
| **Description:** | PURSUANT TO SEC RULE 17A-4(F)(2), NOTICE IS MADE THAT BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC WILL BE UTILIZING THE SERVICES OF PROOFPOINT FOR ELECTRONIC RECORDKEEPING EFFECTIVE AUGUST 1, 2021. |
| **Name:** | MICROSOFT CORPORATION |
| **Business Address:** | ONE MICROSOFT WAY<br>REDMOND, WA  98052 |
| **Effective Date:** | 03/17/2020 |
| **Description:** | STORES ELECTRONIC RECORDS PURSUANT TO SEC RULE 17A-4 |
| **Name:** | BROADRIDGE FINANCIAL SOLUTIONS, INC |
| **Business Address:** | 2 JOURNAL SQUARE<br>NEW JERSEY, CO  07306 |
| **Effective Date:** | 06/01/2011 |
| **Description:** | STORES ELECTRONIC RECORDS PURSUANT TO SEC RULE 17A-4 |
| **Name:** | IRON MOUNTAIN INFORMATION MANAGEMENT, LLC |
| **Business Address:** | 1 FEDERAL STREET<br>BOSTON, MA  02110 |
| **Effective Date:** | 12/06/2005 |
| **Description:** | IRON MOUNTAIN INFORMATION MANAGEMENT, LLC STORES BOXES CONTAINING PRINTED RECORDS MAINTAINED PURSUANT TO RULE 17A-4 |
| **Name:** | JPMORGAN CHASE BANK, NA |
| **Business Address:** | 1125 17TH STREET<br>FLOOR 03<br>DENVER, CO  80202 |
| **Effective Date:** | 12/23/2010 |

www.finra.org/brokercheck
**Firm Operations**
Case 3:20-cv-01915-E   Document 51   Filed 11/08/21   Page 56 of 58   PageID 610
User Guidance



## Industry Arrangements (continued)

| | |
|---|---|
| **Description:** | JPMORGAN CHASE MAINTAINS THE WIRE ORDER RECORDS FOR MSCS FINANCIAL SERVICES DIVISION OF BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC, BANK ACCOUNT, EFFECTIVE 12/23/2010. |
| **Name:** | MATRIX SETTLEMENT & CLEARANCE SERVICES, LLC |
| **Business Address:** | 717 17TH STREET, S1300 DENVER, CO 80202 |
| **Effective Date:** | 01/01/2005 |
| **Description:** | MATRIX SETTLEMENT & CLEARANCE SERVICES, LLC (MSCS) PERFORMS ALL THE BOOKKEEPING AND ACCOUNTING FUNCTIONS FOR MSCS FINANCIAL SERVICES DIVISION OF BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC. THESE ACCOUNTING FUNCTIONS INCLUDE, BUT ARE NOT LIMITED TO, ACCOUNTS RECEIVABLE, ACCOUNTS PAYABLE, AND GENERAL LEDGER ACCOUNTING. |

**This firm does not have accounts, funds, or securities maintained by a third party.**

**This firm does not have customer accounts, funds, or securities maintained by a third party.**

**Control Persons/Financing**

**This firm does not have individuals who control its management or policies through agreement.**

**This firm does not have individuals who wholly or partly finance the firm's business.**

www.finra.org/brokercheck

# Firm Operations

## Organization Affiliates

This section provides information on control relationships the firm has with other firms in the securities, investment advisory, or banking business.

**This firm is not, directly or indirectly:**
· **in control of**
· **controlled by**
· **or under common control with**
**the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.**

**This firm is not directly or indirectly, controlled by the following:**
· **bank holding company**
· **national bank**
· **state member bank of the Federal Reserve System**
· **state non-member bank**
· **savings bank or association**
· **credit union**
· **or foreign bank**

www.finra.org/brokercheck



**End of Report**

This page is intentionally left blank.

©2021 FINRA. All rights reserved.    Report about BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC

**Appendix 056**    17